**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DEWANE PARKER,<br><br>                                   Plaintiff,<br><br>v.<br><br>ATLANTIC CITY BOARD OF<br>EDUCATION, ET AL,<br><br>                                   Defendants. | *Civil Action*<br><br>Case No. 1:15-cv-08712-JHR-JS<br><br>HON. JOEL SCHNEIDER<br>UNITED STATES MAGISTRATE JUDGE<br>MITCHELL H. COHEN U.S.<br>COURTHOUSE<br>ONE JOHN F. GERRY PLAZA<br>FOURTH AND COOPER STREETS<br>CAMDEN, NJ 08101<br><br>**JOINT FINAL<br>PRETRIAL ORDER** |

Appearances:    **Counsel for Plaintiff Dewane Parker,
                Levine, Staller, Sklar, Chan & Brown, P.A.,
                3030 Atlantic Avenue, Atlantic City, NJ 08401
                (T) 609-348-1300; (F) 609-345-2473**

                **Counsel for Defendants, Atlantic City Board
                Of Education, Barry Caldwell, John Devlin,
                Donna Haye, and Paul Spaventa
                Jasinski, P.C.
                60 Park Place, 8th Floor
                Newark, NJ  07102
                (T) 973-824-9700; (F)  973-824-6061**

## PART I.   JURISDICTION AND BRIEF SUMMARY OF THE CASE

### A.   JURISDICTION

The causes of action which form the basis of this matter arise under the New Jersey Conscientious Employee Protection Act N.J.S.A. 34:19-1 *et seq*. ("CEPA"), the First Amendment of the United States Constitution (rights of freedom of speech and

association), and the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et seq*.   The District Court has jurisdiction over Count III (federal constitutional claims) pursuant to 28 U.S.C. § 1331.   The District Court has supplemental jurisdiction over Plaintiff's claims in Count I (CEPA) and Count III (New Jersey Civil Rights Act) pursuant to 28 U.S.C. § 1367.

### B.   PLAINTIFF'S BRIEF SUMMARY OF CLAIMS

Plaintiff was employed by the Atlantic City Board of Education ("ACBOE") as the District Supervisor of Security from May 2001 until June 30, 2015. Parker was responsible for, among other things, maintaining the safety and welfare of the students of Atlantic City High School and other schools within the School District. In addition, Parker spearheaded a task force on gang violence. During his tenure as supervisor, and later, Supervisor of Security and Truancy, he consistently received excellent evaluations; his record was unblemished. Parker's supervisor through 2014, Defendant Barry Caldwell ("Caldwell"), consistently rated Parker as excellent.

Mr. Parker's whistleblowing began in September 2002 when he objected to and advised then Superintendent Nickles that building principal LaGreta Brown had instructed security personnel to turn off fire alarms in the high school building.  This action led to the first of many RICE notices issued by the ACBOE to Mr. Parker.

Mr. Parker also objected when Board member and Personnel Committee Chairperson John Devlin used information he learned during the course of his employment as an Atlantic City police officer to have a RICE notice issued to Mr. Parker on November 17, 2011 so that the ACBOE could discuss Mr. Parker's continued employment. Superintendent Nickles told Mr. Parker that John Devlin was upset with Parker since Mr. Parker's private security business was taking jobs away from Atlantic City police officers. In response, Mr. Parker filed an ethics complaint with the New Jersey School Ethics Commission against Mr. Devlin. Superintendent Nickles advised Mr. Parker that he should withdraw the ethics complaint as he was "burning a bridge" which would lead to "potential consequences."

In the fall of 2014, Mr. Parker objected to leaving key security positions vacant so they could later be filled with Defendant Caldwell's political supporters. Parker also refused to assist Caldwell with ACBOE member re-election campaigns including John Devlin's re-election bid, as he objected to and refused to back Caldwell's "friends and family" plan. Parker further objected to returning the overtime pay he received from working during Hurricane Sandy and advised Superintendent Haye that Caldwell did not work the overtime hours he claimed during Hurricane Sandy.

Mere months later, in the Spring of 2015, under the false pretense of "budgetary savings," Parker was informed that his

position was going to be eliminated as non-essential.  Under  the
cover of a fiscal crisis, Plaintiff's bad faith termination was
lumped into an otherwise valid reduction in force ("RIF").  The
ACBOE misled Plaintiff by giving him notice that he would be placed
on a special eligibility list for rehire if a position reopened in
his department.

        While  certain  supervisory  positions  were  targeted  for
elimination, Plaintiff's "non-essential" position was brought back
just six weeks later with a new title of "Coordinator of Public
Safety" and a nearly identical job description.  The job paid less
than  the  previous  position;  however,  prior  to  termination,
Plaintiff offered to take a reduction in compensation, in light of
the ACBOE's fiscal situation.

        Upon learning of the "new position," Plaintiff applied.  He
was the most qualified candidate, having already performed in the
position for the past 14 years. Yet, he was blackballed by Caldwell
who admits he was the "gatekeeper" for hiring.   Because Parker
objected to Caldwell's politics, nepotism, and unlawful acts, a
rift developed, which sealed Parker's professional fate.

        Plaintiff  seeks damages, including back pay, front pay,
compensatory damages for including, but not limited to emotional
distress, liquidated damages, punitive damages, and attorneys'
fees and costs.

### C.   DEFENDANTS' BRIEF SUMMARY OF DEFENSES

On June 30, 2015, the ACBOE conducted a valid and lawful reduction in force ("RIF") at the direction of a Monitor appointed by the State of New Jersey ("State Monitor").  Plaintiff along with 226 other employees lost their jobs.  Plaintiff now sues claiming the RIF was part of a grand conspiracy designed to target and unlawfully terminate him.  Plaintiff's theory sounds preposterous; the record confirms it is preposterous.

The only causes of action remaining following Defendants' Motion for Summary Judgment are Plaintiff's claims under CEPA, the United States Constitution (First Amendment), and the New Jersey Civil Rights Act ("NJCRA").  All of Plaintiff's claims are barred as a matter of law.  More so, no record evidence supports any of Plaintiff's accusations.

Plaintiff cannot establish any elements of a CEPA claim -- whether he attempts to assert this cause of action either pre- or post-termination.  As to his pre-termination CEPA claim, Plaintiff cannot demonstrate:  (1)  that he engaged in any protected, whistleblowing activity;  (2)  causation -- virtually all of Plaintiff's alleged whistleblowing occurred years before the RIF and, therefore, are time-barred and the State Monitor, who alone made the decision to include Plaintiff in the RIF, had absolutely no knowledge about any of these purported activities; (3) that he

was subjected to an adverse employment action at the hands of his employer at any point during his employment, i.e., Plaintiff received numerous raises, all positive performance reviews over his fourteen year employment, increased responsibilities and accolades (given by the same people he now contends retaliated against him), he was never disciplined and the ACBOE voted to reinstate Plaintiff, but was overruled by the State Monitor who, as a matter of law, was not Plaintiff's employer; and (4) pre-text -- Plaintiff proffers not a single piece of evidence undermining the legitimate, non-retaliatory reasons why he was included in the RIF (i.e., the $20 million financial crisis facing the Board).  As to his post-termination CEPA claim, it is barred as a matter of law as CEPA protects current, not former employees and because Plaintiff cannot establish the latter elements, even if he could bring such a claim.

Plaintiff's remaining constitutional and NJCRA claims also fail based on the record and as a matter of law.  Plaintiff cannot establish any of the elements associated with these causes of action.  As to his claim under the First Amendment, Plaintiff did not engage in constitutionally protected conduct, i.e., he cannot make out a *prima facie* case; he was not subjected to retaliatory action; he cannot establish a causal link between the alleged protected conduct and retaliation; and he proffers no basis to dispute the legitimate, non-retaliatory reasons for the RIF.

Plaintiff was included in the RIF because of his position and his salary; it had nothing to do with his purported protected speech. Plaintiff also cannot establish any of the elements of his NJCRA claim.   As set forth above, Plaintiff did not engage in any protected activity and his purported protected political association/affiliation played absolutely no role in the decision to include Plaintiff in the RIF and to not rehire him subsequent to his termination.

Here, the record simply does not support any conclusion that Plaintiff's alleged free speech, expression or association played any role in the decision to eliminate his position and/or the decision not to rehire him.   Regardless of what Plaintiff claims he said, expressed, or how he associated, the record is clear that his purported protected activity would not have altered and did not play any role in the decision to include Plaintiff in the RIF and not rehire him.   The State Monitor had no knowledge that Plaintiff ever engaged in this alleged activity and the State Monitor alone made the decision to eliminate Plaintiff's position. Further, the School District cannot be held liable as there is no evidence that Plaintiff was deprived of any constitutional rights because of any policy, statement, ordinance, regulation, or decision officially adopted and promulgated by the School District or pursuant to a governmental custom.   Moreover, at no time during Plaintiff's employment was he ever punished, disciplined, or

otherwise demoted; he received exemplary reviews, raises, renewals and promotions from all those whom he now accuses of retaliating against him in this case.

As to the School District's decision not to rehire Plaintiff, he has no one but himself to blame.  Following the RIF, Plaintiff, the former head of security, admits he took a School District's vehicle without permission; repeatedly entered the School District's building without permission; failed to return the School District's property; and called his former supervisor "a coward." Plaintiff was not the only employee upset about the RIF; however, his admitted behavior, which he now labors to minimize, provides ample justification for the School District's decision. Plaintiff also admits he had no tenure, seniority or bumping rights.  Thus, for Plaintiff to now claim the School District "misled" him into believing he had a right to return to his job is an utter fallacy.

Finally, Plaintiff has no grounds to sue the individual Defendants who are also shielded by qualified immunity.  Plaintiff also cannot establish any damages.  Here, the Court dismissed Plaintiff's claims for negligent and intentional infliction of emotional distress in their entirety.  Plaintiff did not seek reconsideration of the Court's Summary Judgment Order.  Thus, Plaintiff has no basis to seek to recover any emotional distress damages and is barred from attempting to do so at trial.

{00085678 6}                                8

Furthermore, Plaintiff has failed to mitigate his damages which also diminishes and/or bars his recovery for any economic loss. Lastly, even if Plaintiff should prevail, any award of attorneys' fees should be drastically reduced as the vast majority of Plaintiff's claims in this case have been summarily dismissed.

**PART II.  STIPULATED FACTS**

1. Mr. Parker was the District Supervisor of Security for the Atlantic City School District ("School District") from May 9, 2001 until June 30, 2015.  Mr. Parker's job title changed to District Supervisor of Security and Truancy on August 1, 2009. ACBOE/PARKER 15, 49; ACBOE/Parker-013-016; and ACBOE/Parker-103503-103504.

2. Mr. Parker's employment with the School District ended on June 30, 2015.  Parker 1; ACBOE/Parker-103503-103504.

3. Barry Caldwell was the District's Assistant Superintendent of Operations throughout Mr. Parker's employment and his immediate supervisor.  From May 31, 2015 until June 30, 2015, Mr. Caldwell was the Interim Superintendent for the District.  Caldwell dep. 11:13-17; 12:9-11; ACBOE/PARKER 31; Parker dep. 275:17-19.  Pl. Dep. 275:17-19, and Court Docket, Doc. No. 22.

4. Paul Spaventa became the District's Interim Superintendent on July 1, 2015.  Spaventa dep. 17:13-18; 27:6-9; 38:7-12.

5. Donna Haye was the District's Superintendent from July 1, 2012 until May 30, 2015.  Haye Dep. 10:23-11:11.

6. Former Superintendent Fred Nickles retired on June 30, 2012. Nickels dep. 9:6-7.

7. Donald Harris was the acting principal for the High School in or around June and July 2015.

8. The ACBOE approved the Coordinator of Public Safety position on August 24, 2015.  ACBOE/PARKER 104255-86.

9. Plaintiff refused to sign the hand-delivery receipt for the Reduction and/or Reappointment Notice ("Notice") and instead wrote the following comment:

> I am refusing to sign this due to my supervisor, Ass't Supt. Barry S. Caldwell didn't have the decency to sit down with me and give this memo to me out of respect of 14 years of service under him.  (ACBOE/Parker-63-64.)

10. The School District created and publicly posted a position titled the "Coordinator of Public Safety" to oversee security in the School District's schools following the RIF.  (Pl. Dep. 296:12-23; Caldwell Dep. 147:25-148:22.)

11. The Coordinator of Public Safety position provided an annual salary of approximately $50,000.00 with no benefits. (ACBOE/Parker-1662-1663; McCartney Dep. 69:6-19.)

12. Plaintiff received numerous raises while employed by the School District.  (ACBOE/Parker-1662-1663.)

13. Plaintiff received longevity pay from the School District every year following the 2009/2010 school year. (ACBOE/Parker-1662-1663)

14. At the time of the RIF, Plaintiff's salary had increased by 105% from his initial hiring date. (ACBOE/Parker—1662-1663; ACBOE/Parker-013-016.)

### PART III. PLAINTIFF'S CONTESTED FACTS

### A. Plaintiff intends to prove the following contested facts with regards to liability and damages:

1. During the course of his 14-year employment with the Atlantic City School District, Mr. Parker received positive annual evaluations with raises and promotions and numerous commendations from both within and outside the School District. ACBOE/PARKER 88-89, 90-92, 93-94, 97-98, 95-96, 101-102, 103-104, 99-100, 105-106, 108-109 and 110-111 and ACBOE/PARKER 44, 59, 60, 66, 71, 379 and 76231.

2. Mr. Parker was a non-tenured, non-certificated, non-union, contractual employee whose annual employment contracts ran for one year periods commencing July 1 through June 30 of the following year. Pl. Dep. 126:8-23; Caldwell Dep. at 40:7-9; ACBOE/PARKER 37-38 and 86.

3. John Devlin is an ACBOE member and was the ACBOE President from in or about 2013 through 2015, which included the period during which a reduction in force ("RIF") occurred in June 2015,

Plaintiff's annual employment contract was not renewed and Ernest Jubilee, a retired Chief of the Atlantic City Police Department was hired to fill the Coordinator of Public Safety position, which was filled after Mr. Parker's employment was terminated.  Devlin dep. 96:18-22; Parker 16-17.

4. One year into his employment, Mr. Parker activated the fire alarm and called the fire department because of a fire in a bathroom against the instructions of building Principal LaGreta Brown. Parker dep. 94:18-95:7; Nickles dep. 36, 41-42.

5. The Atlantic City School District had previously been fined by the Atlantic City Fire Department because the fire alarm had been deactivated.  Parker dep. 93:24-94:4; Nickles dep. 37:4-23.

6. Following Mr. Parker's activation of the fire alarm, LaGreta Brown threatened to have him fired.  Parker dep. 92:24-93:10.

7. Mr. Parker complained to Mr. Caldwell and then Superintendent Fred Nickles that LaGreta Brown threatened to have him fired because he activated the fire alarm.  Parker dep. 96:7 - 97:2; Nickles dep. 36, 41-42.

8. On September 5, 2002, Mr. Parker was issued a "RICE" notice advising him his employment would be discussed at the September 10, 2002 ACBOE meeting.  ACBOE 8.

9.  Mr. Parker's employment was discussed at the September 10, 2002 ACBOE meeting and the ACBOE voted not to terminate Mr. Parker's employment.  Parker dep. 119-121.

10. Mr. Devlin was first appointed to the Board in 2003 or 2004. Mr. Devlin held, at times, the position of Vice-President and President, and sat on various Board committees including the Personnel Committee.  Mr. Devlin was also an Atlantic City Police Officer throughout Mr. Parker's employment with the District.  Devlin dep. 6:13-23; 13:6-20; 15:19-16:24; 18:7-20; 96:18-22.

11. Mr. Devlin complained to Superintendent Nickles that Mr. Parker's private security company was taking outside work details away from Atlantic City Police officers.  Nickles dep. 16:12-21.

12. On December 12, 2011, Plaintiff filed an ethics complaint against Mr. Devlin with the New Jersey Department of Education, in which he complained that Mr. Devlin disclosed information he obtained from the Atlantic City and Galloway Police Departments to Superintendent Nickles in an effort to negatively affect Plaintiff's employment.  Parker 343-44, 363-69.

13. Superintendent Nickles advised Plaintiff not to file the ethics complaint against Devlin as he would be "burning a bridge." Nickles dep. 25-27.

14. On or about July 20, 2012, Plaintiff wrote to the School Ethics Commission of New Jersey and advised that he had to withdraw his complaint against John Devlin.  Parker 362.

15. Ms. Haye told Mr. Caldwell that Mr. Parker made her aware that Caldwell did not want her to be the new superintendent.  Haye dep. 28:5-12.

16. Mr. Parker and along with other School District personnel performed work to provide relief efforts at and around the Atlantic City High School as a result of Hurricane Sandy in October 2012.  Parker dep. 194:4-14; ACBOE/PARKER 66.

17. Since Superintendent Haye was away on vacation during Hurricane Sandy, Mr. Caldwell was in charge.  Haye dep. 31:16-24.

18. The School District employees who worked during Hurricane Sandy were instructed by Mr. Caldwell to submit their hours for payment.  Parker dep. 194:4-14; Parker 75.

19. Mr. Caldwell signed and approved requests for payment submitted by Mr. Parker and other staff members in his department.  Parker 75.

20. In 2014, the State investigated these payments.  Parker dep. 247:7-8.

21. In the wake of the investigation, Mr. Caldwell and other employees in his department repaid the money paid to them for work performed in connection with Hurricane Sandy.  Parker dep. 243-47.

{00085678 6}                    14

22. Mr. Caldwell told Mr. Parker to repay the money he received for
    working during Hurricane Sandy.  Parker dep. 243-47.

23. Mr. Parker and another employee, Gary Adair, the Supervisor of
    Maintenance, refused to return their Hurricane Sandy pay.
    ACBOE/PARKER 70336; Parker 182.

24. Following Mr. Parker's refusal to return his Hurricane Sandy
    pay, the School District issued Mr. Parker a RICE notice
    advising him his employment would be discussed at the February
    23, 2015 ACBOE meeting.  ACBOE/PARKER 67.

25. At the February 23, 2015 ACBOE meeting, the ACBOE voted to
    require employees to return Hurricane Sandy compensation.
    ACBOE/PARKER 461.

26. Mr. Parker and Gary Adair refused to return the compensation
    and each retained an attorney to represent them on this issue.
    Parker 182.

27. ACBOE Policy 4233 prohibits soliciting campaign workers on
    school property.  ACBOE/PARKER 102633.

28. In 2014, Mr. Caldwell supported the ACBOE reelection campaigns
    of John Devlin and his running mates, Ed Cooper and Al Thomas.
    Caldwell dep. 62:7-25; 63:3-6.

29. Mr. Parker did not campaign on behalf of any ACBOE members.
    Parker dep. 248:23-25.

30. At or about the beginning of the 2014/15 school year, the
    Security department had 3 vacancies.  ACBOE/PARKER 85406-8.

31. Mr. Parker conducted interviews to fill the positions and recommended to Mr. Caldwell candidates to be hired. ACBOE/PARKER 85331.

32. Mr. Caldwell did not recommend to the ACBOE any candidates from those interviewed and the positions remained vacant.   ACBOE 85649-51; Parker dep. 316:5-14.

33. Atlantic City School Board elections took place on November 4, 2014.   Press of AC.

34. Mr. Devlin and Ed Cooper were reelected and Al Thomas was newly elected.   Press of AC.

35. Dr. McCartney was appointed to oversee the School District due to the undisciplined fiscal atmosphere that existed within the School District.   McCartney dep. 19:11-20:5.

36. Dr. McCartney believed that among the problems that led to his appointment were politics and nepotism within the School District.   McCartney dep. 29.

37. In a February 27, 2015 email to Dr. McCartney, Mr. Devlin stated "I have heard scuttle butt (sic) regarding Chief Dewane (sic) Parker and others collecting overtime payments . . . ."  Parker-McCartney 347.

38. In a March 31, 2015 email to Dr. McCartney, Mr. Devlin stated "What's disturbing is the 'chief' of security said there was no violence since 2002, and the police have not responded to the high school."  Parker-McCartney 729.

39. On June 21, 2015, Mr. Devlin forwarded an email from Brenda Rice to Dr. McCartney indicating it was from a teacher regarding Mr. Parker's work performance.  Parker-McCartney 1359.

40. But, Brenda Rice was not a teacher, but rather a security officer whom Mr. Parker supervised.  ACBOE/PARKER 102715.

41. By April 21, 2015, Dr. McCartney had proposed a list of positions to be eliminated, which included Mr. Parker's position. Parker-McCartney 909.

42. Prior to Dr. McCartney's April 21, 2015 proposed list, Dr. McCartney had asked Mr. Caldwell numerous times for his input regarding which positions should be eliminated, but when he received no response, Dr. McCartney prepared the proposed list. McCartney dep. 53:20-55:25.

43. The proposed list of position eliminations was shared with Superintendent Haye and Mr. Caldwell at an April 22, 2015 meeting.  Parker-McCartney 929.

44. Prior to May 13, 2015, Dr. McCartney advised Ms. Haye, Mr. Caldwell and other members of the Central Office Leadership that since almost every supervisory position was being eliminated, they would have to restructure an administrative approach to provide supervision.  Parker-McCartney 94.

45. The State Monitor relied on the School District's administrators to determine how it would supervise ground-level security

without a supervisor of security and truancy position. McCartney dep. 120-122.

46. At a June 29, 2015 ACBOE meeting, Assistant Superintendent Sherry Yahn advised the board members that 18 supervisory positions were restructured into five director positions and interviews were being conducted on June 30, 2015 to fill those positions.  ACBOE/PARKER 207-209.

47. All five of the new director positions were filled with employees whose employment was terminated in the RIF.  PARKER 635-38.

48. Kurt Austin, the Supervisor of Facilities, was not terminated. Parker-McCartney 1751.

49. The ACBOE advised Mr. Parker that his employment was terminated in a May 13, 2015 letter from Ms. Haye.  Parker 1.

50. The May 13, 2015 termination letter advised Plaintiff he would be "placed on a preferred eligible list for future employment in the district" and that if a vacancy "in the employment category in which [he had] served" became available, he would be offered a position in accordance with [his] seniority rights."  Id.

51. Plaintiff was never advised by the Defendants that the May 13, 2015 letter was inaccurate in any way.  Parker dep. 296:12-299:14.

52. Mr. Caldwell and Mr. Parker never discussed Plaintiff's employment termination following the May 13, 2015 letter. Caldwell dep. 108:20 – 109:9.

53. By letters dated May 12, 2015, May 19, 2015 and May 29, 2015, the State Monitor overruled three separate actions taken by ACBOE prior to Parker's Donaldson Hearing. ACBOE/PARKER 103507 (overruled Board's rejection of budget, position abolishment, seniority list and recall list), 103506 (overruled Board's rejection of budget), 103505 (overruled Board's rejection of reduction in force).

54. On June 29, 2015, at a Special Meeting of the Board, seven Donaldson Hearings, one of which was at Plaintiff's request, were conducted for non-tenured employees that were previously notified that they had been non-renewed; Plaintiff attended this hearing.   Pl. Dep. 272:23-274:18,309:18-21;  ACBOE/Parker-103503-103504 (ACBOE/PARKER 208-209).

55. During the June 29, 2015 ACBOE Special Meeting and prior to the ACBOE's vote on Parker's request to be reinstated, ACBOE Solicitor Donio advised the ACBOE that the State Monitor believed he had the ability to overturn ACBOE decisions and had already overturned three such votes.  ACBOE/PARKER 207-209.

56. At the June 29, 2015 ACBOE Special Meeting, the ACBOE voted to reinstate Plaintiff and six other employees slated for termination.  ACBOE/PARKER 207-209.

57. Mr. Devlin and Ed Cooper, the ACBOE Vice President were not
    present at the June 29, 2015 ACBOE Special Meeting and therefore
    did not participate in the vote on whether to reinstate
    Plaintiff and/or the others. Devlin dep. 96:18-22; ACBOE/PARKER
    104289-91.

58. At the June 29, 2015 ACBOE Special Meeting, board member
    Patricia Bailey acknowledged that the vote to reinstate
    Plaintiff and the others might be reversed.  ACBOE/PARKER 207-
    209.

59. On July 1, 2015, the State Monitor, Dr. McCartney, overruled
    the Board's June 29, 2015 decision to reinstate Plaintiff and
    six other employees.  Pl. Dep. 273:4-274:18; McCartney Dep.
    144:10-145:24; ACBOE/Parker-103503-103504.

60. As a result of Dr. McCartney's July 1, 2015 override, neither
    Plaintiff nor the six other employees were reinstated.  (Pl.
    Dep. 273:4-274:18; McCartney Dep. 144:10-145:24; ACBOE/Parker-
    103503-103504.)

61. By letter dated July 1, 2015 from the ACBOE Secretary, copied
    to Paul Spaventa and Barry Caldwell, Plaintiff was notified that
    the State Monitor had reversed his employment reinstatement.
    ACBOE/PARKER 57.

62. When Mr. Adair retired on May 1, 2015, the ACBOE did not deduct
    anything from his accrued vacation time to take back the pay he

earned while working during Hurricane Sandy.   ACBOE/PARKER 103320.

63. In July 2015, after Mr. Parker's employment was terminated, the School District deducted the amount of the Hurricane Sandy payments made to Mr. Parker from his accrued vacation time. ACBOE/PARKER 435.

64. As a result, Mr. Parker sued the ACBOE on August 7, 2015. ACBOE/PARKER 431-33.

65. Not until after Mr. Parker initiated a lawsuit to recover his vacation time did the ACBOE file suit against Mr. Adair to take back the money paid to Mr. Adair for working during Hurricane Sandy.   See ECF Document 80-6 (Page 2 of 68).

66. The New Jersey Superior Court ruled that the ACBOE improperly deducted the Hurricane Sandy payments from Mr. Parker's accrued vacation pay.   ACBOE/PARKER 383.

67. Plaintiff's job performance was not a factor in the decision to terminate his employment.   Caldwell dep. 112.

68. Building principals, along with each school's technology coordinator, attended a meeting on June 4, 2015 to review exit procedures for employees whose employment was to be terminated in connection with RIF including procedures to return school-issued technology.   Parker-McCartney 1290.

69. Mr. Parker's office was located in the high school.   Parker dep. 95:18-19.

70. Mr. Caldwell received the serial numbers for Plaintiff's iPad and laptop computer via email dated June 29, 2015.  ACBOE/PARKER 105253.

71. After Plaintiff was notified his reinstatement was overturned, he and Derek Cason met with Principal Donald Harris who told Plaintiff to take his time cleaning out his office.   Parker dep.279:6-9.

72. Plaintiff's building access card was not deactivated when his employment was terminated.

73. In early July 2015, Plaintiff went to the High School to remove his personal belongings from his office and used a District pick-up truck to take those belongings home while leaving his personal car at the High School.   Parker dep. 282:3-16.

74. After being advised by a security officer at the High School that Plaintiff was using a district truck to remove his personal belongings from his office, Mr. Caldwell did not call Plaintiff. Caldwell dep. 124:2-11.

75. On July 9, 2015, Mr. Spaventa filed a criminal complaint against Plaintiff in which he alleged Plaintiff had not returned the laptop computer and iPad.  ACBOE/PARKER 216.

76. Mr. Caldwell went with Mr. Spaventa to the Atlantic City Police station when Mr. Spaventa filed the criminal complaint against Mr. Parker.  Caldwell dep. 124:22 to 125:4.

77. Other District employees whose employment was terminated at the same time as Plaintiff's and who still possessed District property and/or equipment after their terminations were not criminally charged. ACBOE 104532, 104612.

78. Mr. Spaventa did not file a criminal complaint against any other employee who was late in returning school issued property. Spaventa dep. 97:13-21; Parker dep. 291:1-15; Caldwell dep. 138:15-20.

79. Mr. Spaventa did not consult anyone from the technology department or Principal Donald Harris before filing the criminal complaint against Mr. Parker. Spaventa dep. 64:24 to 65:6.

80. Plaintiff had already returned the iPad on July 7, 2015 before Spaventa filed the criminal complaint. ACBOE/PARKER 219.

81. No one from the School District, including Mr. Spaventa, contacted Plaintiff about the laptop computer or iPad before Mr. Spaventa filed the criminal complaint. Spaventa dep. 85:8-12.

82. Plaintiff returned the laptop computer to Dr. McCartney on July 9, 2015. ACBOE/PARKER 219.

83. Haye never filed a criminal complaint against an employee who had not returned school property. Haye dep. 80:25-81:4.

84. Caldwell never contacted Dorothy Griffiths, an employee of the District's technology department, to see if she gave Parker extra time to return his equipment. Caldwell dep. 137:2-7.

85. Mr. Caldwell drafted the job description for the Coordinator of Public Safety position which replaced Mr. Parker's position. Caldwell dep. 153-57.

86. The position held by Plaintiff as the Supervisor of Security and Truancy was almost identical to the Coordinator of Public Safety position.  ECF Document 66 – 2/17/17 Memorandum Opinion and Order.

87. Mr. Caldwell was looking to hire a retired law enforcement person for the position.  Caldwell dep. 176-78.

88. Plaintiff timely applied for the Coordinator of Public Safety position.  Parker 25-31; ACBOE/PARKER 1893-1906.

89. Two (2) of the requirements for the Coordinator of Public Safety position was 10 years of law enforcement experience and 5 years law enforcement supervisory experience.  Parker 4.

90. By virtue of his prior employment as a Federal law enforcement officer and having served as the Supervisor of Security for the Atlantic City School District for fourteen years, Mr. Parker possessed the minimum qualifications for the Coordinator of Public Safety position. ACBOE/PARKER 1-3.

91. At least one of the other applicants for the Coordinator of Public Safety Position, Ray Ellis, was interviewed, but had no law enforcement supervisory experience listed in his application materials.  ACBOE/PARKER 173-74.

92. Plaintiff was not interviewed and was not hired for the position of Coordinator of Public Safety.  Parker dep.

93. Mr. Caldwell decided which candidates to interview for the position.  Caldwell dep. 173:11-17.

94. A former Atlantic City Police Chief, Ernest Jubilee, was hired for the Coordinator of Public Safety position.  Parker 16-17.

95. Plaintiff offered to take a pay cut after he received the May 13, 2015 termination notice.  Parker dep. 269:21 - 270:11.

96. Plaintiff was qualified for the Coordinator of Public Safety position. ACBOE/PARKER 1900-1906.

97. Mr. Caldwell told Plaintiff he had to be more "political." Parker dep. 313:20-314:1.

98. Kurt Austin was "political" and supported Mr. Caldwell in everything he wanted.  Parker dep. 138:9-11.

99. Dr. McCartney believed some of the conditions that led to the installation of a State Monitor included a lack of discipline in hiring, an absence of policies to ensure fiscal responsibility, nepotism and politics.  McCartney dep. 27:17 - 28:24; 29:15-23.

100. Superintendent Haye told Plaintiff she had no power with the ACBOE and that Mr. Caldwell had power with the Board.  Parker dep. 263:2-5.

101. Superintendent Haye believed it was necessary to "stay[] in her lane" in order to work with Assistant Superintendent Caldwell. Haye dep. 26-28.

102. Plaintiff told Haye that Caldwell could not have worked 54 hours overtime during Hurricane Sandy. Parker dep. 190:6-13; 195:19-23.

103. Caldwell tried to pressure Plaintiff into returning the monies he was paid for working during Hurricane Sandy and Parker refused. Parker dep. 244:4 - 247:23.

104. The ACBOE deducted from Plaintiff's accrued vacation time an amount equal to the money he was previously paid for working during Hurricane Sandy because Plaintiff refused to return it. ACBOE/PARKER 435.

105. Mr. Caldwell told Plaintiff "I need you to work on the campaign [ACBOE campaign of Devlin, Cooper and Thomas] or you might lose your job, based on what's going on." Parker dep. 247:24-248:11.

106. Caldwell told Plaintiff he had to be more political and do favors and look out for people Caldwell supported. Parker dep. 138:2-8.

107. Parker told Caldwell he would not be political and would not help with the campaigns of Devlin, Ed Cooper and Al Thomas. Parker dep. 144:22-145:5; 250:5-10.

108. Caldwell removed Plaintiff's attendance duties in retaliation for his refusal to support Caldwell's ACBOE candidates. Parker dep. 202:12-203:5.

109. Plaintiff complained to Haye that Caldwell removed his attendance duties and Haye said she could not do anything about it as the Board members were part of "Barry's crew." Parker dep. 201:1-7.

110. Caldwell told Plaintiff to urge former superintendent Nickles to stay on for another term as superintendent. Parker dep. 174:16-23.

111. Caldwell told Plaintiff he would not fill vacant security positions until after the ACBOE elections so he could use the positions as rewards for people who supported his candidates. Parker dep. 316:5-14.

112. Plaintiff complained to Haye that Caldwell was holding the positions open for political reasons but Haye refused to act. Parker dep. 262:18-263:5.

113. Caldwell supervised and staffed the departments with the most non-certificated and/or non-instructional positions, which were subject to less restrictive hiring and/or firing requirements than certificated instructional positions, which enabled Caldwell to more easily fill vacancies in such positions with individuals he wished to reward for having done political work

or from whom he wanted to garner political favor.  ACBOE/PARKER
103450.

114. Devlin told former Superintendent Nickles that he did not like
that Plaintiff's private security company took jobs away from
Atlantic City police officers.  Nickles dep.  16:12-21.

115. Dorothy  Griffiths,  an  ACBOE  employee  in  the  technology
department told Plaintiff he could return his laptop computer
by July 12, 2015 and to discard his outdated flip style cellular
telephone.  Parker dep. 280:8-12; 344:10-13; 276:11-16.

116. Defendants'  proffered  reason  for  terminating  Plaintiff's
employment is a pretext for unlawful retaliation.

117. Defendants  used  the  RIF  as  cover  to  unlawfully  terminate
Plaintiff's  employment  in  retaliation  for  Plaintiff's
complaints  about  Defendants'  unlawful  and/or  improper
activities.

118. If  offered  the  position  of  Coordinator  of  Public  Safety,
Plaintiff would have accepted the position.  Parker dep. 324:4-
5.

119. John Devlin wanted to disparage Plaintiff in the eyes of the
State Monitor.

120. The State Monitor would have had no problem with Plaintiff being
hired as Coordinator of Public Safety. McCartney dep. 129:20-
130:3.

{00085678 6}                          28

121. Plaintiff was subjected to unlawful retaliation, including but not limited to the termination of his employment in violation of the CEPA.

122. Plaintiff's rights under the United States and New Jersey constitutions were violated by Defendants in that Defendants terminated Plaintiff's employment in retaliation for exercising his free speech and association rights.

**B.   Plaintiff intends to prove the following facts regarding damages:**

1. Plaintiff is entitled to economic damages, including back-pay and front-pay.

2. Plaintiff has suffered emotional distress damages as a result of Defendants' retaliatory conduct.

3. There was "actual participation and/or willful indifference by Defendants' upper management" in the retaliatory conduct to which Plaintiff was subjected.

4. Defendants' acts were done with malice and/or reckless indifference to Plaintiff's rights.

5. Plaintiff is entitled to punitive damages.

6. Plaintiff is entitled to his attorneys' fees and costs.

## PART IV.   DEFENDANTS' CONTESTED FACTS

**A.   Defendants Atlantic City Board of Education, Barry Caldwell, John Devlin, Donna Haye, and Paul Spaventa intend to prove the following contested facts with regard to liability:**

1.   It was solely Dr. McCartney's decision to include Plaintiff's

position in the reduction in force.   (McCartney Dep. 57:21–23;   74:4-75:22;   Caldwell   Dep.   127:5-128:5;   Devlin   Dep. 107:19-108:5; 116:4-10; Haye Dep. 45:5-8.)

2.   Caldwell never made a negative comment about Plaintiff during Dr. McCartney's discussions with Caldwell about Plaintiff's position.   (McCartney Dep. 85:3-16.)

3.   Caldwell testified that throughout Plaintiff's employment, no one came to him about terminating Plaintiff and the School District never posted Plaintiff's position.   (Caldwell Dep. 31:25-32:17; 39:16-25; 40:3-17.)

4.   Plaintiff should have received the RIF/termination letter sent to non-tenured employees.   (McCartney Dep. 73:7-9.)

5.   Spaventa filed the Criminal Complaint to protect the School District and Plaintiff, and to insure Plaintiff returned the District's property.   (Spaventa Dep. 65:7-22; 69:18-71:3; 72:25-73:7; 75:10-18; 93:8-23; 99:4-100:19; 167:16-24.)

6.   Caldwell did not interview Plaintiff based on how Plaintiff behaved after he lost his job following the RIF.   (Caldwell Dep. 162:7-12; 164:12-20; 166:2-167:4; 173:11-17.)

7.   None   of   the   individual   Defendants   played   any   role   in Plaintiff's inclusion in the RIF.   (Pl. Dep. 258:12-260:11.)

8.   Plaintiff contends that starting in 2011 "[Devlin] wanted [him]   removed because [he was] taking jobs from police officers" and because Devlin wanted "a former police officer

{00085678 6}                              30

in the position." (Pl. Dep. 261:5-13.) Meanwhile, Plaintiff admits Devlin served on the Board between 2011 and 2015 and that Plaintiff was reappointed to his position every single year during this period. (Pl. Dep. 261:5-20.)

9. Plaintiff cannot establish any viable causes of action against Defendants for anything that occurred during his employment.

10. Plaintiff cannot establish any viable causes of action against Defendants for anything that occurred after his employment.

11. Plaintiff has no grounds to sue the individual Defendants who are shielded from liability by qualified immunity.

12. Plaintiff also has no grounds to sue the individual Defendants as there is no record evidence that these individuals "aided" or "abetted" the alleged wrongdoer in the purported unlawful actions.

13. Plaintiff cannot establish a CEPA claim against Defendants based on any actions that occurred during his employment.

14. Plaintiff cannot establish a CEPA Claim against Defendants based on any actions that occurred after his employment.

15. Plaintiff did not engage in any activity protected under CEPA either pre- or post-termination with the School District.

16. Plaintiff's alleged whistleblowing activity under CEPA is time-barred.

17.  Plaintiff did not possess a reasonable belief that his
     employer's conduct violated a law, rule, regulation
     promulgated pursuant to law or clear mandate of public policy.

18.  Plaintiff did not perform a "whistle-blowing activity" as
     defined by CEPA either pre- or post-termination with the
     School District.

19.  Plaintiff cannot establish that he was ever subjected to an
     adverse employment action by Defendants.

20.  Plaintiff cannot establish a causal connection between his
     alleged whistle-blowing activity and any adverse employment
     action by Defendants.

21.  Defendants have set forth legitimate, non-retaliatory and
     unrefuted reasons for the elimination of Plaintiff's position
     and his termination.

22.  Plaintiff cannot establish that the legitimate, non-
     retaliatory reasons for the elimination of Plaintiff's
     position and his termination are pre-textual.

23.  Plaintiff cannot prove any element of a CEPA violation, when
     the absence of just one warrants dismissal of his claim.

24.  Plaintiff cannot establish a viable federal or state
     constitutional violation against Defendants for anything that
     occurred during his employment.

25.  Plaintiff did not engage in any conduct protected by the New
     Jersey Constitution or the United States Constitution.

26. Plaintiff was not subjected to any retaliatory action by Defendants because of his alleged protected activity under the New Jersey Constitution or the United States Constitution.

27. Plaintiff cannot establish a causal link between his alleged constitutionally protected activity and any alleged retaliation.

28. Plaintiff's alleged constitutionally protected activity was neither a substantial nor motivating factor in the alleged retaliatory action.

29. Even if Plaintiff engaged in any constitutionally protected activity, it played no role in the decision to include Plaintiff in the RIF and terminate his employment.

30. Plaintiff also proffers no basis to undermine or contradict the legitimate, non-retaliatory reasons as to why Plaintiff was included in the RIF and subsequently terminated.

31. Plaintiff cannot assert a viable state or federal constitutional violation against Defendants for anything that occurred after his employment as Plaintiff was not a public employee when he applied for the Coordinator of Public Safety position.

32. Even if Plaintiff engaged in any constitutionally protected activity, it played no role in the decision not to interview and/or hire him for the position of Coordinator of Public

Safety.

33. Even if he engaged in any constitutionally protected activity, Plaintiff also proffers no basis to undermine or contradict the legitimate, non-retaliatory reasons why he was not interviewed and/or hired for the position of Coordinator of Public Safety.

34. Plaintiff cannot establish a viable NJCRA claim against Defendants for anything that occurred either during or after his employment.

35. Plaintiff did not maintain a political affiliation.

36. Plaintiff was not subjected to any retaliation for his alleged political affiliation or any other state or federally protected constitutional right.

37. Even if Plaintiff engaged in protected activity because of his political affiliation or any other state or federally protected constitutional right, it played no role in the decision to include Plaintiff in the RIF and terminate his employment.

38. Plaintiff cannot establish a viable NJCRA claim against Defendants for anything that occurred after his employment as Plaintiff was not a public employee when he applied for the Coordinator of Public Safety position.

39. Plaintiff was not qualified for the position of Coordinator of Public Safety.

40. Plaintiff also cannot impute liability for his constitutional and/or NJCRA claims against the ACBOE under the <u>Monell</u> doctrine.

41. Plaintiff cannot demonstrate that he had a constitutional right protected by Section 1983 or the NJCRA.

42. Plaintiff cannot establish that he was deprived of a constitutional right covered by Section 1983 or the NJCRA because of a policy, custom, practice, statement, ordinance, regulation, or decision officially adopted and promulgated by the Board or pursuant to a governmental custom.

43. No record evidence exists indicating that the individual Defendants had the final authority representing District policy.

44. To the extent Plaintiff's Section 1985 claim has not already been dismissed, Plaintiff cannot establish the elements necessary to assert same.

45. The School District required $20 million in State assistance to meet its minimum tax levy for the upcoming school year. (McCartney Dep. 27:13-28:24; 72:1-16.)

46. As Monitor, Dr. McCartney did not focus exclusively on a reduction in force to reduce costs; rather, he looked at the utility of every operation within the District including, but not limited to, scrutinizing all of the School District's expenses; reviewing all purchase orders; looking at all of

the School District buildings to see if consolidation was possible; working with real estate agents to explore the possibility of selling vacant buildings; exploring the possibility of moving the Board's office to a new, less expensive space; investigating moving the location of the alternative school; scrutinizing the cost of food services for the students as well as the Board; examining transportation to determine whether busing could be handled more efficiently; and exploring whether the deployment of District personnel could be altered to cut costs. (McCartney Dep. 33:11-34:20.)

47.   During his tenure as State Monitor, Dr. McCartney reduced the School District's budget by over $20 million.   (McCartney Dep. 150:22-151:9.)

48.   At the time Dr. McCartney was contemplating the reduction in force, Plaintiff was earning an annual salary of $102,502.00. (ACBOE/Parker-103500.)

49.   Dr. McCartney believed the School District could not afford the kind of supervision associated with the position of District Supervisor of Security and thought the security supervisor role could be done "far less expensively than [the District] had it structured." (McCartney Dep. 58:20-59:17; 68:18-69:5; 74:4-75:22; 121:7-122:19.)

50.   Dr. McCartney included Plaintiff's position on the reduction

in force list because he felt it was in the students' best interests to retain as many ground-level security guards as possible.  (McCartney Dep. 58:4-19.)

51.  When the reduction in force was implemented on June 30, 2015, Plaintiff and 226 other District employees lost their jobs. (ACBOE/Parker-103503-103504; Parker-422.)

52.  In addition to Plaintiff, twenty-three (23) non-instructional (five (5) non-certified and eighteen (18) certified) employees had their positions eliminated as a result of the RIF.  (Caldwell Dep. 95:1-16; ACBOE/Parker-103496.)

53.  Making an annual salary of $102,502.00 at the time (including additional monies for longevity pay), Plaintiff was the highest paid non-instructional/non-certified employee whose position was eliminated.  (ACBOE/Parker-103500.)

54.  None of the non-tenured, non-certified supervisors included in the RIF ever returned to employment in the District. (Caldwell Dep. 195:6-8.)

55.  Plaintiff was not a teaching staff member and was not included on the preferred eligible list by the State Monitor. Plaintiff also did not have tenure, bumping or re-employment rights.  (Pl. Dep. 267:22-269:4; see also McCartney Dep. 70:25-71:4; 72:22-73:12; ACBOE/Parker-037-038, Parker-645-651.)

56.  The ACBOE voted to reinstate Plaintiff along with six other

employees.   (Pl. Dep. 272:23-274:18; ACBOE/Parker-103503-103504.)

57. Plaintiff admits the Board tried to save his job.   (Pl. Dep. 309:18-21.)

58. The legality of the RIF was challenged and upheld by the New Jersey Office of Administrative Law and the Commissioner of Education.   (ACBOE/Parker-103529-103535.)

59. Plaintiff described his interactions with LaGreta Brown not as whistleblowing, but as a "power struggle." (Pl. Dep. 106:13-16.)

60. In 2011, Plaintiff had an incident with his wife where he stopped communicating with her, was living out of his car, and had called out sick from work because of stress, but did not call in for each day he would miss work.   (Pl. Dep. 210:22-24; 213:1-214:3; 219:1-16; 220:10-12.)   At the time, Caldwell told Plaintiff to take all the time he needed to take.   (Pl. Dep. 219:23-220:1.)

61. Devlin testified he heard a call over his police radio that Plaintiff was missing, suicidal, and possibly had a weapon. (Devlin Dep. 47:5-49:21; 50:4-13; 84:4-12; 86:10-13.)

62. Plaintiff admits the Galloway Police Department found him in an abandoned property urinating in a parking lot.   (Pl. Dep. 211:1-212:16.)

63.  Plaintiff testified that the Galloway Police took him to
     Mainland Hospital to make sure he was okay and he was admitted
     overnight and underwent counseling.  Plaintiff continued to
     undergo counseling after he was released from the hospital.
     (Pl. Dep. 215:20-216:10; 220:24-221:5.)

64.  Plaintiff's absence and disappearance from work was raised
     during a meeting of the ACBOE's Personnel Committee.  (Devlin
     Dep. 50:23-53:24; 54:12-16; 86:10-16.)

65.  Devlin, who at the time served as Chairperson of the Personnel
     Committee, asked during a Committee meeting, whether the
     ACBOE could be exposed to any liability given Plaintiff's
     recent mental health situation and his role as the District's
     Supervisor of Security.  (Devlin Dep. 51:9-11; 53:4-54:3.)

66.  Devlin never spoke about the issue again, and the Board took
     no action against Plaintiff.  (Pl. Dep. 251:18-252:5; Devlin
     Dep. 54:22-55:15.)

67.  Plaintiff voluntarily withdrew his ethics complaint against
     Devlin.  (Pl. Dep. 250:11-15.)

68.  Plaintiff admits the ACBOE took no disciplinary action
     against him following his disappearance. (Pl. Dep. 251:18-
     252:5.)

69.  Devlin voted affirmatively to approve a promotion, raises,
     and stipends for Plaintiff subsequent to Plaintiff's mental
     health incident.  (Devlin Dep. 83:16-25.)

70.  Plaintiff never worked on any Board member's campaign and admits that prior to the RIF, he was never terminated or otherwise lost his job with the School District. (Pl. Dep. 248:23-249:18.)

71.  Throughout his fourteen year employment, Plaintiff received numerous increases in his salary; was given more job responsibilities; and that when it came to raises, he was treated the same as everybody else.   (Pl. Dep. 130:2-5; 140:10-15; 314:2-5.)

72.  Haye approached Plaintiff on the issue of the Superstorm Sandy overtime monies and that he was not subjected to any retaliation as a result of his response to Haye. (Pl. Dep. 197:13-198:19.)

73.  Plaintiff admits he was never asked to "turn a blind eye to" anything illegal while employed in the School District. (Pl. Dep. 307:8-308:11; 314:25-315:6.)

74.  Nickles chose not to remain in the position of Superintendent, and no one tried to terminate Plaintiff as a result.   (Pl. Dep. 179:1-181:19; 314:25-315:6.)

75.  Many employees were understandably upset about losing their jobs as a result of the RIF.   (Caldwell Dep. 108:20-110:9; 120:7-13.)

76.  Plaintiff was particularly angry with Caldwell because Caldwell did not personally deliver the news that his position

had been eliminated by the State Monitor.   (ACBOE/Parker-63-64.)

77. Based on Plaintiff's comments when he received the Notice, such as Plaintiff calling Caldwell a coward, Caldwell thought it was in his best interest not to have a discussion with Plaintiff except for work-related issues.   (Caldwell Dep. 108:20-110:9.)

78. Plaintiff was notified his last day of work was June 30, 2015; however, Plaintiff knew as early as May 5, 2015 that he would be included in the RIF.   (Pl. Dep. 277:24-278:2; 279:20-280:19; ACBOE/Parker-63-64.)

79. Days after his termination, Plaintiff went to the Atlantic City High School; entered the school after hours using his keys and/or access card, which he had not returned; began removing what he contends was his personal property; and then took a vehicle owned and insured by the District without permission from his supervisor.   (Pl. Dep. 282:3-283:3; 284:7-11; 286:5-16; 349:4-15; 349:16-350:10; Caldwell Dep. 117:1-120:25; 144:9-25; ACBOE/Parker-104234-104235.)

80. Following the RIF, Plaintiff was the only former employee who took a vehicle owned by the District without permission to do so.   (Pl. Dep. 29:20-22; 282:3-283:3; 284:7-11; 349:4-15; 349:16-350:10.)

81.  Plaintiff understood that former employees are not permitted to take property belonging to the District. (Pl. Dep. 168:14-23.)

82.  Following the RIF, Plaintiff was the only former employee who possessed Master Keys for the entire District, which he failed to return; he also did not return his District identification/access badge. (Pl. Dep. 286:5-16.)

83.  Following the RIF, Plaintiff was the only former employee discovered entering Atlantic City High School after operating hours without permission to do so.   (ACBOE/Parker-104234-104235.)

84.  Following his termination on June 30, 2015, Plaintiff entered Atlantic City High School more than two dozen times using his identification/access badge:  fifteen times on July 1, 2015; once on July 2, 2015; twice on July 3, 2015; twice on July 6, 2015; twice on July 7, 2015; and four times on July 8, 2015.   (ACBOE/Parker-104234-104235.)

85.  Plaintiff, as the former District Supervisor of Security, understood the danger associated with allowing unauthorized people into a school building.  Pl. Dep. 164:3-18; 165:8-10.)

86.  Plaintiff did not immediately return the Board's laptop computer.  (Pl. Dep. 276:11-277:2; 279:13-15; 279:20-25.)

87.  Caldwell, his immediate supervisor, never told Plaintiff he
     could keep District property or take his time returning it.
     (Pl. Dep. 280:13-281:13.)

88.  Spaventa was in the first week of his employment with the
     District when Plaintiff took the District's vehicle without
     authorization.  (Caldwell Dep. 124:2-21; Spaventa Dep. 50:9-
     51:7; 51:22-52:4; 52:10-19; 54:5-10; 64:6-11; 71:4-23; 74:3-
     75:16; 83:3-7.)

89.  Caldwell, Spaventa, and the State Monitor met, and they agreed
     to call the ACPD so an officer who knew Plaintiff could
     contact him and ask him to return the District property still
     in his possession.   (Caldwell Dep. 119:24-120:25; Spaventa
     Dep. 53:4-54:10; 54:24-56:24; 59:23-60:7; 61:3-8.)

90.  Spaventa was concerned about Plaintiff having taken the
     District's vehicle without authorization; his concern was not
     only for how Plaintiff's actions could affect the District,
     but how those actions could affect Plaintiff.  (Spaventa Dep.
     99:4-100:19.)

91.  Plaintiff had Master Keys for the entire District and its
     vehicles; he knew where security cameras were located; and
     was familiar with what equipment was located in which District
     buildings.   (Spaventa Dep. 99:4-100:19.)

92.  If Board property had gone missing while Plaintiff still had
     unrestricted access to school buildings, there would be

nothing protecting Plaintiff from allegations that he was somehow involved.  (Spaventa Dep. 99:4-100:19.)

93.  Caldwell did not know Plaintiff's mental state at the time Plaintiff took the District vehicle. (Caldwell Dep. 121:6-16.)

94.  While at the ACPD, Spaventa informed the police officer taking the information that he would dismiss the Complaint once Plaintiff returned the items. (Spaventa Dep. 70:15-71:3.)

95.  Deputy Chief Timothy Friel, formerly of the ACPD, spoke with Plaintiff about the unreturned property prior to Spaventa filing the Complaint.  (Pl. Dep. 285:15-286:4; 352:18-25.)

96.  Plaintiff admits Deputy Chief Timothy Friel left him a message on July 9, 2015; told him the District was filing a complaint against him for theft; and told him to return "keys" and "anything" to the State Monitor.   (Pl. Dep. 285:15-286:4; 352:18-25.)

97.  The Complaint was withdrawn after Plaintiff returned all of the District's property.  (ACBOE-Parker – 215-220.)

98.  Spaventa sent a confirming letter to the ACPD verifying dismissal of the Complaint.  (ACBOE-Parker – 215-220.)

99.  The State Monitor tasked the School District with re-designing the management and supervision of security to make it affordable.   (McCartney Dep. 120:21-122:14: 124:8-125:3; Caldwell Dep. 11:13-21.)

100. Dr. McCartney approved the School District's idea about hiring a retired police officer to reduce costs (McCartney Dep. 121:7-17; 122:15-123:1; 124:8-125:3; Caldwell Dep. 150:8-154:16.)

101. The Board was not involved in the screening and selection of Ret. Chief Jubilee as a candidate; Devlin did not participate in the vote.   (Devlin Dep. 140:6-13; 141:23-142:2; 143:12-20; 148:8-149:17.)

102. Plaintiff wrote the State Monitor a Memorandum (dated June 2, 2015) and nowhere in this document does Plaintiff claim to have been subjected to retaliation. (Parker-645-651.)

103. Plaintiff admits he was renewed by the Board fourteen times and that no one ever told him Caldwell wanted him removed. (Pl. Dep. 264:16-266:8; Devlin Dep. 43:21-44:3; 59:19-60:2.)

104. Nickles never spoke to anyone about removing Plaintiff from his position.   (Nickles Dep. 28:14-18; 29:3-13; Devlin Dep. 58:21-59:9.)

105. Plaintiff admits the temporary attendance officer position was never filled by the District.   (Pl. Dep. 256:17-258:4.)

106. Plaintiff's salary was not lowered as a result of the removal of the temporary attendance officer assignment.   (Pl. Dep. 199:24-200:2; ACBOE/Parker-1662-1663.)

107. Plaintiff received nothing but "excellent" evaluations during his fourteen (14) year employment by his direct supervisor,

Caldwell.  (Pl. Dep. 123:12-22; 348:8-10.)

108. Caldwell said Plaintiff did a "[g]reat job" while working for the District.  (Caldwell Dep. 39:2-6.)

109. Plaintiff's annual starting salary was $50,000.00; he received annual increases nearly every single year he was employed by the District until 2014/2015 when Plaintiff's annual salary reached $102,502.00 -- his salary at the time of the RIF.  (ACBOE/Parker-1662-1663; ACBOE/Parker-013-016.)

110. In addition to the salary increase he received in 2009, Plaintiff was promoted to the position of District Supervisor of Security and Truancy wherein he was entrusted with additional job responsibilities.  (Caldwell Dep. 44:10-23; (ACBOE/Parker-1662-1663; ACBOE/Parker - 049.)

111. Haye signed the letter notifying Plaintiff that he had been included in the RIF although the District was under the supervision of the State Monitor.  (Pl. Dep. 261:21-262:15.)

112. Other than this lawsuit, Plaintiff has never made any written complaints accusing Caldwell of retaliating against him.  (Pl. Dep. 177:25-178:4; 263:6-18.)

113. Plaintiff possesses no facts that Spaventa knew anything about Plaintiff's "history with the [B]oard" when Spaventa was hired.  (Pl. Dep. 290:2-20.)

114. The State of New Jersey appointed a Monitor, Dr. Gary McCartney, for the School District commencing in February 2015 through February 2016. McCartney dep. 18:11-12.

115. Mr. Spaventa had no prior experience with the School District and did not know any of the litigants when he was hired as interim Superintendent. (Spaventa Dep. 34:12-15; 36:8-37:9; 44:21-45:10; 45:15-20; 48:24-49:10.)

116. Dr. McCartney's career in education spans more than four decades; he has been employed as a teacher, coach, building principal, assistant superintendent, and superintendent and has taught school law and human resources at the college level. (McCartney Dep. 11:8-11; 12:19-22; 13:9-21; 16:16-17:11.)

117. Dr. McCartney had no experience with the School District prior to his appointment as State Monitor; he did not know any of the litigants. (McCartney Dep. 16:16-17:11; 36:4-22.)

118. Upon his appointment, Dr. McCartney was directed by the New Jersey Department of Education ("DOE") to do the following: "[r]educe the budget [for the District] and make [it] fiscally responsible. Analyze every fiscal decision that's made there and don't approve any event [ ] not in keeping with responsible actions." (McCartney Dep. 33:1-10.)

119. Dr. McCartney's analysis of the School District's operations and fiscal situation led him to conclude that non-personnel

related cuts alone would be insufficient to stem the School District's financial crisis.   (McCartney Dep. 39:12-18.)

120. As a result, Dr. McCartney, acting in concert with the DOE, concluded the School District's fiscal condition necessitated a reduction in force.   (McCartney Dep. 39:12-18.)

121. Dr. McCartney first explored the idea of cutting non-instructional personnel to minimize the impact on students. (McCartney Dep. 52:24-53:19.)

122. LaGreta Brown had no authority to fire Plaintiff and was not Plaintiff's supervisor.   (Pl. Dep. 96:12-97:4; 98:3-11.)

123. According to Caldwell and Nickles, LaGreta Brown did not get along with and was rude to everybody.   (Caldwell Dep. 27:1-6; 31:1-9; Nickles Dep. 34:24-36:10.)

124. LaGreta Brown was subsequently removed by the School District after tenure charges were brought against her. (Nickles Dep. 35:17-36:10.)

125. Plaintiff admits he did not receive a Rice Notice and nobody spoke to him about his employment concerning Plaintiff's outside private security company interfering with the Atlantic City police getting detail work.   Pl. Dep. 313:2-15.

126. Every time Plaintiff worked overtime, Caldwell told Plaintiff to "put in for [it]" and he or the Superintendent would approve it.   (Pl. Dep. 192:5-193:13.)

127. Plaintiff told Caldwell that security officers needed "to take more time with the metal detectors" and that Caldwell disagreed; however, Plaintiff admitted that no laws were being violated; rather, it was just his "professional opinion." (Pl. Dep. 353:1-354:15.)

128. The lists of candidates Plaintiff interviewed for the position of security officers were not generated by Caldwell or Nickles – neither of whom had any input into the creation of these lists which were provided to him and generated by Human Resources. (Pl. Dep. 303:4-24.)

129. Spaventa was not aware at the time he filed the Complaint that one of the items listed (IPAD) had been returned by Plaintiff two days earlier. (Spaventa Dep. 73:20-74:2; ACBOE-Parker – 215-220.)

130. Dr. McCartney believed that the District could no longer afford the supervisory structure that it had in place prior to the RIF. (McCartney Dep. 80:2-81:3; 119:24-120:20; 121:7-122:19.)

131. At the time Spaventa became acting Superintendent on or about July 1, 2015, Plaintiff and Spaventa "had no prior relationship." (Pl. Dep. 290:2-20; 293:17-21.)

132. Plaintiff did not accuse Devlin of retaliation for alleged whistleblowing in his ethics complaint. (Pl. Dep. 210:1-17; ACBOE/Parker/Dept.Ed.OPRA-001-011.)

133. Plaintiff also made no accusations against the ACBOE or any other School District employee in his ethics complaint. (ACBOE/Parker/Dept.Ed.OPRA-001-011.)

134. On July 1, 2015, the State Monitor, Dr. McCartney, overruled the Board's June 29, 2015 decision to reinstate Plaintiff and six other employees. Pl. Dep. 273:4-274:18; McCartney Dep. 144:10-145:24; ACBOE/Parker-103503-103504.   As a result of Dr. McCartney's July 1, 2015 override, neither Plaintiff nor the six other employees were reinstated.   Pl. Dep. 273:4-274:18; McCartney Dep. 144:10-145:24; ACBOE/Parker 103503-103504.

135. Plaintiff never offered to take a reduction in compensation.

    **B.**    **Defendants Atlantic City Board of Education, Barry Caldwell, John Devlin, Donna Haye, and Paul Spaventa intend to prove the following contested facts with regard to damages:**

1. Plaintiff cannot establish any damages.

2. Plaintiff cannot recover any damages for negligent and intentional infliction of emotional distress as the Court dismissed these damage claims in their entirety.  Plaintiff also cannot establish the requisite elements to recover such damages.

3. Plaintiff cannot establish any right to recover punitive damages.

4. Plaintiff cannot establish that has suffered any economic loss or harm.

5. Plaintiff has failed to mitigate his damages which diminishes and/or bars his recovery for any economic loss.

6. Defendants are not liable to Plaintiff for any compensatory damage.

7. Defendants are not liable to Plaintiff for any front pay or back pay damage.

8. Plaintiff is not a prevailing party.

9. Defendants are not liable to Plaintiff for attorneys' fees.

10.  Even if Plaintiff should prevail, any award of attorneys' fees should be drastically reduced as the vast majority of Plaintiff's claims in this case have been summarily dismissed.

### PART V.  LAY WITNESSES AND SUMMARY OF TESTIMONY

   A.  **Plaintiff's Witnesses and Summary of Their Testimony**

   i.  **Plaintiff intends to call the following witnesses with regard to liability and anticipates they will testify as follows:**

   a)  **Dewane Parker, Plaintiff**

c/o Levine Staller
3030 Atlantic Ave.
Atlantic City, NJ 08401
609-348-1300

Plaintiff will testify about events surrounding the allegations in Plaintiff's Amended Complaint; Plaintiff's employment with the ACBOE; conduct by any of the Defendants that Plaintiff believed to violate a law, rule, or regulation promulgated pursuant to law, or clear mandate of public policy;

Plaintiff's objections to, refusals to participate in, and/or complaints about ("whistleblowing") such violations; Defendants' retaliation against Plaintiff; the termination of Plaintiff's employment with the ACBOE; Defendants' conduct toward and actions taken with respect to Plaintiff following the termination of Plaintiff's employment with the ACBOE; Plaintiff's application for the Coordinator of Public Safety position; Defendants' failure to interview and hire Plaintiff for the Coordinator of Public Safety position; the emotional distress Plaintiff has experienced following the termination of his employment with the ACBOE; Plaintiff's attempts to obtain employment following the termination of his employment with the ACBOE; Defendants' withholding of monies from Plaintiff representing Plaintiff's accrued vacation time following the termination of his employment with the ACBOE; Plaintiff's lawsuit against the ACBOE for the return of the monies representing the accrued vacation time withheld from Plaintiff; Defendant ACBOE's Answer, Affirmative Defenses, and Counterclaim against Plaintiff in response to Plaintiff's lawsuit to recover his accrued vacation time; Defendant ACBOE's lawsuit against Gary Adair for the return of monies paid to Gary Adair representing Gary Adair's accrued vacation time at the time Gary Adair's employment with the ACBOE ended; any and all subjects about which Plaintiff testified at his deposition in this matter.

### b)   Derek Cason

Former Employee of Defendants

Plaintiff anticipates Derek Cason will testify about events surrounding the allegations in Plaintiff's Amended Complaint; Plaintiff's employment with the ACBOE; Mr. Cason's experiences working with Plaintiff while employed with the ACBOE; the termination of Plaintiff's employment with the ACBOE; Plaintiff's interaction with members of the ACBOE and fellow employees of the ACBOE both during and following Plaintiff's employment with the ACBOE; Plaintiff's actions following the termination of Plaintiff's employment with the ACBOE; and Defendants' conduct toward and actions taken with respect to Plaintiff following the termination of Plaintiff's employment with the ACBOE.

### c)   Dorothy Griffiths

Employee of Defendants

Plaintiff anticipates Ms. Griffiths will testify about events surrounding the allegations in Plaintiff's Amended Complaint; Plaintiff's employment with the ACBOE; Ms. Griffiths' experiences working with Plaintiff while employed with the ACBOE; the termination of Plaintiff's employment with the ACBOE; ACBOE policies and procedures concerning school issued equipment; Ms. Griffiths' interactions with members of the ACBOE and/or ACBOE employees regarding the return of school-issued equipment and/or property in or about June and July 2015; Ms. Griffiths'

interactions with Plaintiff regarding the return of Plaintiff's
school-issued equipment and/or property in or about June and July
2015; Plaintiff's removal of personal belongings from his office
in the High School; The return of Plaintiff's school-issued
equipment and/or property; Plaintiff's interaction with members of
the ACBOE and fellow employees of the ACBOE both during and
following Plaintiff's employment with the ACBOE; Plaintiff's
actions following the termination of Plaintiff's employment with
the ACBOE; and Defendants' conduct toward and actions taken with
respect to Plaintiff following the termination of Plaintiff's
employment with the ACBOE.

### d)   Paul Spaventa, Defendant

c/o Jasinski, P.C.
60 Park Place
Newark, NJ 07102

<u>Former Employee of Defendant</u>

Plaintiff anticipates Mr. Spaventa will testify about events
surrounding the allegations in Plaintiff's Amended Complaint;
Defendants' Answer to Plaintiff's Amended Complaint and
Affirmative Defenses thereto; Plaintiff's employment with the
ACBOE; ACBOE policies and procedures concerning school issued
equipment; Plaintiff's interaction with members of the ACBOE and
employees of the ACBOE following Plaintiff's employment with the
ACBOE; the development and creation of the Coordinator of Public
Safety position and other supervisory positions following the

{00085678 6}                          54

Reduction in Force that took place in June 2015; the process by which the Coordinator of Public Safety position was filled; Plaintiff's application for the Coordinator of Public Safety position; The decision not to interview and hire Plaintiff for the Coordinator of Public Safety position; Plaintiff's actions following the termination of Plaintiff's employment with the ACBOE; the filing of a criminal complaint against Plaintiff following the termination of Plaintiff's employment with the ACBOE; ACBOE's re-hiring of individuals whose employment with ACBOE was terminated in or about June 2015; Defendants' conduct toward and actions taken with respect to Plaintiff following the termination of Plaintiff's employment with the ACBOE; Defendants' withholding of monies from Plaintiff representing Plaintiff's accrued vacation time following the termination of his employment with the ACBOE; Plaintiff's lawsuit against the ACBOE for the return of the monies representing the accrued vacation time withheld from Plaintiff; Defendant ACBOE's Answer, Affirmative Defenses, and Counterclaim against Plaintiff in response to Plaintiff's lawsuit to recover his accrued vacation time; Defendant ACBOE's lawsuit against Gary Adair for the return of monies paid to Gary Adair representing Gary Adair's accrued vacation time at the time Gary Adair's employment with the ACBOE ended; meetings of the ACBOE, both public and non-public sessions, attended by Paul Spaventa relating to the allegations in

Plaintiff's Amended Complaint, Defendants' Answer to Plaintiff's Amended Complaint and Affirmative Defenses thereto, Plaintiff and Plaintiff's employment with the ACBOE, the termination of Plaintiff's employment with the ACBOE, the development and creation of the Coordinator of Public Safety position and other supervisory positions following the Reduction in Force that took place in June 2015, the process by which the Coordinator of Public Safety position was filled, the filing of a criminal complaint against Plaintiff following the termination of Plaintiff's employment with the ACBOE, ACBOE's re-hiring of individuals whose employment with ACBOE was terminated in or about June 2015, the withholding of Plaintiff's accrued vacation time following the termination of Plaintiff's employment with the ACBOE, Plaintiff's lawsuit against the ACBOE for the return of the accrued vacation time withheld from Plaintiff, Defendant ACBOE's Answer, Affirmative Defenses, and Counterclaim against Plaintiff in response to Plaintiff's lawsuit to recover his accrued vacation time, Defendant ACBOE's lawsuit against Gary Adair for the return of monies paid to Gary Adair representing Gary Adair's accrued vacation time at the time Gary Adair's employment with the ACBOE ended; Paul Spaventa's answers to interrogatories and any and all amendments and/or supplements thereto in this matter; and any and all subjects about which Paul Spaventa testified during his deposition in this matter.

### e)   Barry Caldwell, Defendant

c/o Jasinski, P.C.
60 Park Place
Newark, NJ 07102

Plaintiff anticipates Mr. Caldwell will testify about events surrounding the allegations in Plaintiff's Amended Complaint; Defendants' Answer to Plaintiff's Amended Complaint and Affirmative Defenses thereto; Plaintiff's employment with the ACBOE; the Reduction in Force in or about June 2015; the termination of Plaintiff's employment with the ACBOE; Plaintiff's performance evaluations while employed with the ACBOE; Plaintiff's objections to, refusals to participate in, and/or complaints about ("whistleblowing") conduct by Defendants and/or each of them that Plaintiff believed to violate a law, rule, or regulation promulgated pursuant to law, or clear mandate of public policy; ACBOE policies and procedures concerning school issued equipment; Plaintiff's interaction with members of the ACBOE and employees of the ACBOE both during and following Plaintiff's employment with the ACBOE; Defendants' conduct toward and actions taken with respect to Plaintiff following the termination of Plaintiff's employment with the ACBOE; the development and creation of the Coordinator of Public Safety position and other supervisory positions following the Reduction in Force that took place in June 2015; the process by which the Coordinator of Public Safety position was filled; Plaintiff's application for the Coordinator

of Public Safety position; the decision not to interview and hire Plaintiff for the Coordinator of Public Safety position; Plaintiff's actions following the termination of Plaintiff's employment with the ACBOE; the filing of a criminal complaint against Plaintiff following the termination of Plaintiff's employment with the ACBOE; ACBOE's re-hiring of individuals whose employment with ACBOE was terminated in or about June 2015; Defendants' withholding of monies from Plaintiff representing Plaintiff's accrued vacation time following the termination of his employment with the ACBOE; Plaintiff's lawsuit against the ACBOE for the return of the monies representing the accrued vacation time withheld from Plaintiff; Defendant ACBOE's Answer, Affirmative Defenses, and Counterclaim against Plaintiff in response to Plaintiff's lawsuit to recover his accrued vacation time; Defendant ACBOE's lawsuit against Gary Adair for the return of monies paid to Gary Adair representing Gary Adair's accrued vacation time at the time Gary Adair's employment with the ACBOE ended; meetings of the ACBOE, both public and non-public sessions, attended by Barry Caldwell relating to the allegations in Plaintiff's Amended Complaint, Defendants' Answer to Plaintiff's Amended Complaint and Affirmative Defenses thereto, Plaintiff and Plaintiff's employment with the ACBOE, the termination of Plaintiff's employment with the ACBOE, the development and creation of the Coordinator of Public Safety position and other

supervisory positions following the Reduction in Force that took place in June 2015, the process by which the Coordinator of Public Safety position was filled, the filing of a criminal complaint against Plaintiff following the termination of Plaintiff's employment with the ACBOE, ACBOE's re-hiring of individuals whose employment with ACBOE was terminated in or about June 2015, the withholding of Plaintiff's accrued vacation time following the termination of Plaintiff's employment with the ACBOE, Plaintiff's lawsuit against the ACBOE for the return of the accrued vacation time withheld from Plaintiff, Defendant ACBOE's Answer, Affirmative Defenses, and Counterclaim against Plaintiff in response to Plaintiff's lawsuit to recover his accrued vacation time, Defendant ACBOE's lawsuit against Gary Adair for the return of monies paid to Gary Adair representing Gary Adair's accrued vacation time at the time Gary Adair's employment with the ACBOE ended; Barry Caldwell's answers to interrogatories and any and all amendments and/or supplements thereto in this matter; and any and all subjects about which Barry Caldwell testified at his deposition in this matter.

### f)    Donna Haye, Defendant

c/o Jasinski, P.C.
60 Park Place
Newark, NJ 07102

Plaintiff anticipates Ms. Haye will testify about events surrounding the allegations in Plaintiff's Amended Complaint;

Defendants' Answer to Plaintiff's Amended Complaint and Affirmative Defenses thereto; Plaintiff's employment with the ACBOE; The Reduction in Force in or about June 2015; The termination of Plaintiff's employment with the ACBOE; Plaintiff's performance evaluations while employed with the ACBOE; Plaintiff's objections to, refusals to participate in, and/or complaints about ("whistleblowing") conduct by Defendants and/or each of them that Plaintiff believed to violate a law, rule, or regulation promulgated pursuant to law, or clear mandate of public policy; ACBOE policies and procedures concerning school issued equipment; Plaintiff's interaction with members of the ACBOE and fellow employees of the ACBOE during Plaintiff's employment with the ACBOE; meetings of the ACBOE, both public and non-public sessions, attended by Donna Haye relating to the allegations in Plaintiff's Amended Complaint, Defendants' Answer to Plaintiff's Amended Complaint and Affirmative Defenses thereto, Plaintiff and Plaintiff's employment with the ACBOE, and the termination of Plaintiff's employment with the ACBOE; Donna Haye's answers to interrogatories and any and all amendments and/or supplements thereto in this matter; and any and all subjects about which Donna Haye testified at her deposition in this matter.

### g)   John Devlin, Defendant

c/o Jasinski, P.C.
60 Park Place
Newark, NJ 07102

Plaintiff anticipates Mr. Devlin will testify about events surrounding the allegations in Plaintiff's Amended Complaint; Defendants' Answer to Plaintiff's Amended Complaint and Affirmative Defenses thereto; Plaintiff's employment with the ACBOE; the Reduction in Force in or about June 2015; the termination of Plaintiff's employment with the ACBOE; Plaintiff's performance evaluations while employed with the ACBOE; Plaintiff's objections to, refusals to participate in, and/or complaints about ("whistleblowing") conduct by Defendants and/or each of them that Plaintiff believed to violate a law, rule, or regulation promulgated pursuant to law, or clear mandate of public policy; ACBOE policies and procedures concerning school issued equipment; Plaintiff's interaction with members of the ACBOE and employees of the ACBOE both during and following Plaintiff's employment with the ACBOE; Defendants' conduct toward and actions taken with respect to Plaintiff following the termination of Plaintiff's employment with the ACBOE; the development and creation of the Coordinator of Public Safety position and other supervisory positions following the Reduction in Force that took place in June 2015; the process by which the Coordinator of Public Safety position was filled; Plaintiff's application for the Coordinator of Public Safety position; The decision not to interview and hire Plaintiff for the Coordinator of Public Safety position;

Plaintiff's actions following the termination of Plaintiff's employment with the ACBOE; the filing of a criminal complaint against Plaintiff following the termination of Plaintiff's employment with the ACBOE; ACBOE's re-hiring of individuals whose employment with ACBOE was terminated in or about June 2015; Defendants' withholding of monies from Plaintiff representing Plaintiff's accrued vacation time following the termination of his employment with the ACBOE; Plaintiff's lawsuit against the ACBOE for the return of the monies representing the accrued vacation time withheld from Plaintiff; Defendant ACBOE's Answer, Affirmative Defenses, and Counterclaim against Plaintiff in response to Plaintiff's lawsuit to recover his accrued vacation time; Defendant ACBOE's lawsuit against Gary Adair for the return of monies paid to Gary Adair representing Gary Adair's accrued vacation time at the time Gary Adair's employment with the ACBOE ended; meetings of the ACBOE, both public and non-public sessions, attended by John Devlin relating to the allegations in Plaintiff's Amended Complaint, Defendants' Answer to Plaintiff's Amended Complaint and Affirmative Defenses thereto, Plaintiff and Plaintiff's employment with the ACBOE, the termination of Plaintiff's employment with the ACBOE, the development and creation of the Coordinator of Public Safety position and other supervisory positions following the Reduction in Force that took place in June 2015, the process by which the Coordinator of Public

Safety position was filled, the filing of a criminal complaint against Plaintiff following the termination of Plaintiff's employment with the ACBOE, ACBOE's re-hiring of individuals whose employment with ACBOE was terminated in or about June 2015, the withholding of Plaintiff's accrued vacation time following the termination of Plaintiff's employment with the ACBOE, Plaintiff's lawsuit against the ACBOE for the return of the accrued vacation time withheld from Plaintiff, Defendant ACBOE's Answer, Affirmative Defenses, and Counterclaim against Plaintiff in response to Plaintiff's lawsuit to recover his accrued vacation time, Defendant ACBOE's lawsuit against Gary Adair for the return of monies paid to Gary Adair representing Gary Adair's accrued vacation time at the time Gary Adair's employment with the ACBOE ended; John Devlin's answers to interrogatories and any and all amendments and/or supplements thereto in this matter; and any and all subjects about which John Devlin testified at his deposition in this matter.

### h)   Dr. Gary McCartney

<u>Former State Appointed Monitor</u>

Plaintiff anticipates Dr. McCartney will testify about events surrounding Dr. McCartney's appointment as Monitor for the Atlantic City School District; the Reduction in Force in or about June 2015; the allegations in Plaintiff's Amended Complaint; Defendants' Answer to Plaintiff's Amended Complaint and

Affirmative Defenses thereto; Plaintiff's employment with the ACBOE; the termination of Plaintiff's employment with the ACBOE; Plaintiff's performance evaluations while employed with the ACBOE; Plaintiff's objections to, refusals to participate in, and/or complaints about ("whistleblowing") conduct by Defendants and/or each of them that Plaintiff believed to violate a law, rule, or regulation promulgated pursuant to law, or clear mandate of public policy; ACBOE policies and procedures concerning school issued equipment; Plaintiff's interaction with members of the ACBOE and fellow employees of the ACBOE both during and following Plaintiff's employment with the ACBOE; Defendants' conduct toward and actions taken with respect to Plaintiff following the termination of Plaintiff's employment with the ACBOE; the development and creation of the Coordinator of Public Safety position and other supervisory positions following the Reduction in Force that took place in June 2015; the process by which the Coordinator of Public Safety position was filled; Plaintiff's application for the Coordinator of Public Safety position; the decision not to interview and hire Plaintiff for the Coordinator of Public Safety position; Plaintiff's actions following the termination of Plaintiff's employment with the ACBOE; the filing of a criminal complaint against Plaintiff following the termination of Plaintiff's employment with the ACBOE; ACBOE's re-hiring of individuals whose employment with ACBOE was terminated in or about

June 2015; Defendants' withholding of monies from Plaintiff representing Plaintiff's accrued vacation time following the termination of his employment with the ACBOE; Plaintiff's lawsuit against the ACBOE for the return of the monies representing the accrued vacation time withheld from Plaintiff; Defendant ACBOE's Answer, Affirmative Defenses, and Counterclaim against Plaintiff in response to Plaintiff's lawsuit to recover his accrued vacation time; Defendant ACBOE's lawsuit against Gary Adair for the return of monies paid to Gary Adair representing Gary Adair's accrued vacation time at the time Gary Adair's employment with the ACBOE ended; meetings of the ACBOE, both public and non-public sessions, attended by Dr. Gary McCartney relating to the allegations in Plaintiff's Amended Complaint, Defendants' Answer to Plaintiff's Amended Complaint and Affirmative Defenses thereto, Plaintiff and Plaintiff's employment with the ACBOE, the termination of Plaintiff's employment with the ACBOE, the development and creation of the Coordinator of Public Safety position and other supervisory positions following the Reduction in Force that took place in June 2015, the process by which the Coordinator of Public Safety position was filled, the filing of a criminal complaint against Plaintiff following the termination of Plaintiff's employment with the ACBOE, ACBOE's re-hiring of individuals whose employment with ACBOE was terminated in or about June 2015, the withholding of Plaintiff's accrued vacation time following the

termination of Plaintiff's employment with the ACBOE, Plaintiff's lawsuit against the ACBOE for the return of the accrued vacation time withheld from Plaintiff, Defendant ACBOE's Answer, Affirmative Defenses, and Counterclaim against Plaintiff in response to Plaintiff's lawsuit to recover his accrued vacation time, Defendant ACBOE's lawsuit against Gary Adair for the return of monies paid to Gary Adair representing Gary Adair's accrued vacation time at the time Gary Adair's employment with the ACBOE ended; and any and all subjects about which Dr. Gary McCartney testified at his deposition in this matter.

### i)    Donald Harris

Employee of Defendant ACBOE

Plaintiff anticipates Mr. Harris will testify about events surrounding the allegations in Plaintiff's Amended Complaint; Plaintiff's employment with the ACBOE; Mr. Harris' experiences working with Plaintiff while employed with the ACBOE; the termination of Plaintiff's employment with the ACBOE; ACBOE policies and procedures concerning school issued equipment; Mr. Harris' interactions with members of the ACBOE and/or ACBOE employees regarding the return of school-issued equipment and/or property in or about June and July 2015; Mr. Harris' interactions with Plaintiff regarding the return of Plaintiff's school-issued equipment and/or property in or about June and July 2015; Plaintiff's removal of personal belongings from his office in the

High School; The return of Plaintiff's school-issued equipment and/or property; Plaintiff's interaction with members of the ACBOE and fellow employees of the ACBOE both during and following Plaintiff's employment with the ACBOE; Plaintiff's actions following the termination of Plaintiff's employment with the ACBOE; and Defendants' conduct toward and actions taken with respect to Plaintiff following the termination of Plaintiff's employment with the ACBOE.

### j)   Gary Adair

<u>Former Employee</u>

Plaintiff anticipates Mr. Adair will testify about events surrounding the allegations in Plaintiff's Amended Complaint; Plaintiff's employment with the ACBOE; Mr. Adair's experiences working with Plaintiff while employed with the ACBOE; the termination of Plaintiff's employment with the ACBOE; Plaintiff's interaction with members of the ACBOE and fellow employees of the ACBOE both during and following Plaintiff's employment with the ACBOE; Plaintiff's actions following the termination of Plaintiff's employment with the ACBOE; Defendant ACBOE's lawsuit against Gary Adair for the return of monies paid to Gary Adair representing Gary Adair's accrued vacation time at the time Gary Adair's employment with the ACBOE ended; and Defendants' conduct toward and actions taken with respect to Plaintiff following the termination of Plaintiff's employment with the ACBOE.

ii. **Plaintiff intends to call the following witnesses with regards to damages and anticipates they will testify as follows:**

### a) Dewane Parker, Plaintiff

Plaintiff will testify about events and the circumstances relating to his back-pay, front-pay, and the emotional distress Defendants' retaliatory acts have caused.

### b) Deborah Parker

Ms. Parker will testify about events and the circumstances relating to Plaintiff's emotional distress caused by Defendants' retaliatory acts.

### B. Defendants' Objections to Plaintiff's Witnesses

Defendants object to Gary Adair on the basis of relevance. ~~Defendants also object to Plaintiff's intention to have witnesses testify "without limitation".~~ Defendants further reserve the right to object to the entirety and/or any portion of the testimony of all of Plaintiff's witnesses as per the Federal Rules of Evidence.

### C. Defendants' Witnesses and Summary of Their Testimony

1.  <u>Defendant Barry Caldwell</u>
    c/o Peter P. Perla, Esq.
    Jasinski, P.C.
    60 Park Place, 8th Floor
    Newark, NJ 07102

    Mr. Caldwell will testify about: events surrounding Plaintiff's employment with the ACBOE; the reduction in force conducted in 2015; Plaintiff's separation from

employment with the ACBOE; events following Plaintiff's separation of employment with the ACBOE; Plaintiff's lawsuits; information supporting the ACBOE's defenses to Plaintiff's allegations in this case; and any and all subjects about which he testified at his deposition.

2. Defendant John Devlin
   c/o Peter P. Perla, Esq.
   Jasinski, P.C.
   60 Park Place, 8th Floor
   Newark, NJ  07102

   Mr. Devlin will testify about: events surrounding Plaintiff's employment with the ACBOE; the reduction in force conducted in 2015; Plaintiff's separation from employment with the ACBOE; events following Plaintiff's separation of employment with the ACBOE; Plaintiff's lawsuits; information supporting the ACBOE's defenses to Plaintiff's allegations in this case; and any and all subjects about which he testified at his deposition.

3. Defendant Donna Haye
   c/o Peter P. Perla, Esq.
   Jasinski, P.C.
   60 Park Place, 8th Floor
   Newark, NJ  07102

   Ms. Haye will testify about:  events surrounding Plaintiff's employment with the ACBOE; the reduction in force conducted in 2015; Plaintiff's lawsuit; information supporting the ACBOE's defenses to Plaintiff's allegations in this case; and any and all subjects about which she testified at her deposition.

4. Paul Spaventa
   c/o Peter P. Perla, Esq.
   Jasinski, P.C.
   60 Park Place, 8th Floor
   Newark, NJ  07102

   Mr. Spaventa will testify about:  events surrounding Plaintiff's employment with the ACBOE; the reduction in force conducted in 2015; Plaintiff's separation from employment with the ACBOE; events following Plaintiff's separation of employment with the ACBOE; Plaintiff's lawsuits; information supporting the ACBOE's defenses to

Plaintiff's allegations in this case; and any and all subjects about which he testified at his deposition.

5.  Dr. Gary McCartney
    Gary P McCartney
    3730 Pheasant Hill Drive
    Allentown, PA 18104

    Dr. McCartney will testify about:  events surrounding Plaintiff's employment with the ACBOE; the reduction in force conducted in 2015; Plaintiff's separation from employment with the ACBOE; events following Plaintiff's separation of employment with the ACBOE; Plaintiff's lawsuits; information supporting the ACBOE's defenses to Plaintiff's allegations in this case; and any and all subjects about which he testified at his deposition.

6.  Randy Kanter
    Califon Consulting
    86 Annin Road
    West Caldwell, NJ  07006

    Mr. Kanter will testify about: the reduction in force conducted in 2015 as well as information supporting the ACBOE's defenses to Plaintiff's allegations in this case.

7.  Ret. Chief Ernest C. Jubilee, II
    Atlantic City Board of Education
    1300 Atlantic Avenue
    Atlantic City, NJ  08401

    Ret. Chief Jubilee will testify about:  his knowledge of his hiring by the ACBOE in 2015 to serve as Coordinator of Public Safety as well as information supporting the ACBOE's defenses to Plaintiff's allegations in this case.

8.  Pedro Rivera
    Atlantic City Board of Education
    1300 Atlantic Avenue
    Atlantic City, NJ  08401

    Mr. Rivera will testify about:  events surrounding Plaintiff's employment with the ACBOE as well as information supporting the ACBOE's defenses to Plaintiff's allegations in this case.

9.  Deputy Police Chief Timothy Friel
    Atlantic City Police Department
    2715 Atlantic Avenue
    Atlantic City, NJ  08401

    Deputy Police Chief Friel will testify about: events
    surrounding Plaintiff's separation from employment from
    the ACBOE; events following Plaintiff's separation from
    employment from the ACBOE; as well as information
    supporting the ACBOE's defenses to Plaintiff's
    allegations in this case.

10. Sherry Yahn
    Atlantic City Board of Education
    1300 Atlantic Avenue
    Atlantic City, NJ  08401

    Ms. Yahn will testify about: events surrounding
    Plaintiff's employment with the ACBOE; the reduction in
    force conducted in 2015; Plaintiff's separation from
    employment with the ACBOE; events following Plaintiff's
    separation of employment with the ACBOE; Plaintiff's
    lawsuits; as well as information supporting the ACBOE's
    defenses to Plaintiff's allegations in this case.

11. Ydearia Ely
    16318 Eastham Court
    Bowie, MD  20716

    Ms. Ely will testify about:  events surrounding
    Plaintiff's employment with the ACBOE; her personal
    relationship with Plaintiff; as well as information
    supporting the ACBOE's defenses to Plaintiff's
    allegations in this case.

12. Donald Harris
    Atlantic City Board of Education
    1300 Atlantic Avenue
    Atlantic City, NJ  08401

    Mr. Harris will testify about:  events surrounding
    Plaintiff's employment with the ACBOE as well as
    information supporting the ACBOE's defenses to
    Plaintiff's allegations in this case.

### D.   Plaintiff's Objections to Defendants' Witnesses

Plaintiff objects to Ydearia Ely on the basis of relevance. Plaintiff further reserves the right to object to the entirety and/or any portion of the testimony of all of Defendant's remaining witnesses in accordance with the Federal Rules of Evidence.

## PART VI.   EXPERT WITNESSES

### A.   Plaintiff

1.   Plaintiff's expert witness is David Hopkins.  Mr. Hopkins will testify without limitation to Plaintiff's back-pay, front-pay, and loss of fringe benefits.

a.   Plaintiff intends to pose the following hypothetical questions to Mr. Hopkins:

1.   If Mr. Parker's employment had not been terminated at the end of June 2015, what would his compensation have been from that point until now (date of expert witness testimony)?

2.   If Mr. Parker's employment had not been terminated at the end of June 2015, what would his expected compensation have been from now (date of expert witness testimony) until his reasonably expected retirement date?

3.   If Mr. Parker's employment had not been terminated at the end of June 2015, what would he have earned in retirement benefits from his reasonably expected retirement date until his reasonably expected date of death?

{00085678 6}                               72